Filed 11/29/23  In re Z.B. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re Z.B. et al., Persons Coming Under the Juvenile Court Law. | D082433 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | (Super. Ct. Nos. J520668A-C) |
| Plaintiff and Respondent, | |
| v. | |
| K.K., | |
| Defendant and Appellant; | |
| L.H., | |
| Respondent. | |

APPEAL from orders of the Superior Court of San Diego County, Alexander M. Calero, Judge.  Affirmed.

Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant, K.K.

Leslie A. Barry, under appointment by the Court of Appeal, for Respondent, L.H.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Kristen M. Ojeil, Deputy County Counsel, for Plaintiff and Respondent.

INTRODUCTION

After declaring them dependents of the court, the juvenile court removed L.B., S.B., and Z.B. (together, the children) from the physical custody of their mother, K.K. (Mother). Three-year-old L.B. and S.B. (collectively, the twins) were placed in a resource home while four-year-old Z.B. was ordered to go on a home visit with L.H. (Father) in Iowa. Mother appeals those dispositional orders. She argues that substantial evidence does not support the court's findings, by clear and convincing evidence, that there were no reasonable means to protect the children without removing them from her custody. We disagree and affirm the dispositional orders.

FACTUAL AND PROCEDURAL BACKGROUND

A.     *Background Information*

Mother began drinking alcohol in high school. Her drinking became an issue beginning with her divorce in 2016, when she began drinking every day. Although she stopped drinking for periods of time since then, she resumed drinking whenever there was a stressor.

In July 2019, Mother was arrested because she was driving under the influence (DUI), punched her boyfriend in the face, and tossed Z.B. onto a bed. A year later, Mother was arrested again following a physical altercation with her boyfriend. She was so intoxicated that she pulled down her pants and began defecating and urinating in front of the law enforcement officers. Three months later, Mother was intoxicated and transported to the hospital, while the children entered a foster care facility because no other family members could care for them.

2

B.    *The First Dependency Case*

In February 2021, Mother was arrested again for a DUI violation after she engaged in two hit and run collisions with her children in the car. Following this incident, Mother's first dependency case was opened, and the children were engaged in a family reunification, then family maintenance case with Mother from March 2021 to October 2022.

During Mother's case, she secured an Alcoholics Anonymous (AA) sponsor and completed a 12-step program. She also attended a DUI program, which included having a breathalyzer installed on her vehicle.

Mother's boyfriend (the twins' father) did not successfully complete services and had a criminal protective order protecting the children and Mother from him. (He is not a party to this appeal.) Father resides in Iowa and was not ordered into services, but he got cited for a DUI violation in August 2022, and was diagnosed with severe alcohol use disorder and alcohol dependence.

In October 2022, the juvenile court followed the Agency's recommendation, terminated jurisdiction and awarded sole physical custody to Mother. Mother also received sole legal custody for the twins and shared legal custody of Z.B. with Father. Father received supervised visits with Z.B. in Iowa, while the boyfriend was granted unsupervised visits with the twins.

C.    *Facts Leading to Present Dependency Case*

In early April 2023, just six months after the court terminated jurisdiction, Mother was again arrested for a DUI violation. She had L.B. in the car and a blood alcohol level of .327, four times the legal limit. She was driving on the highway with a popped tire and would not pull over until another driver got in front of her and forced her to stop. She was belligerent,

3

uncooperative, and bit and kicked a Marine who was there to help the law enforcement officer.

Law enforcement officers performed a welfare check two days later and found Mother lying on the closet floor and unresponsive. There were clothes, trash, and dirty diapers everywhere. Z.B. was hungry and there was little food in the refrigerator. Mother eventually responded to the officers, was very intoxicated and threatened to hurt herself if her children were removed. The psychiatric emergency response team involuntarily retained her on a 72-hour Welfare and Institutions Code[1] section 5150 psychiatric hospitalization. While hospitalized, Mother admitted to the social worker that she relapsed and made threats to kill herself if the kids were taken away. Mother also gave the Agency the names of a few people it could assess as a safety plan for the children.

In an interview with the social worker, the boyfriend reported that Mother has a long history of alcoholism. She could not care for her children when she drank because she passed out and left the children unattended and neglected. In addition to alcohol, she also abused Xanax and Ambien, which caused her to black out. She also had a history of threatening suicidal ideation.

The boyfriend was not an available noncustodial parent given the active criminal protective order. The Agency had not yet been able to contact Father.

D.     *The Petitions and Detention Hearing*

In April 2023, the Agency filed petitions under section 300, subdivision (b) as to all the children. The petitions alleged they "suffered or there is a

---

[1]     All further undesignated statutory references are to the Welfare and Institutions Code.

substantial risk that the children will suffer, serious physical harm or illness." The petition cited Mother's "long history of alcohol abuse and involvement with Child Welfare Services due to alcohol abuse, including driving while intoxicated" with the children. The children were detained in a confidential resource home.

At the detention hearing, the juvenile court found that continued care in Mother's home was contrary to the children's welfare. The juvenile court also found "it would be a detriment to place the children" with Father. The boyfriend did not request detention. The children were removed from Mother's custody and detained in a resource family home.

E.    *The Agency's Jurisdiction/Disposition Report*

In mid-April 2023, Mother once again was placed on a section 5150 psychiatric hold because she made suicidal statements after drinking heavily and taking 14 sleeping pills.

Mother reported to the social worker that she would do whatever she needed to do to regain custody of her children, including wearing a SCRAM CAM (alcohol monitoring) bracelet to prove she was not drinking. She said, " 'I will blow in breathalyzers and get a [SCRAM CAM]. I need to get them home ASAP.' " She admitted relapsing and believed, " 'It reinforces I cannot drink.' "

Mother said she was diagnosed with situational depression and that she would want to take medication when her relationship is bad. She stated she had been seeing a psychiatrist since 2020 and had been on the same medication for years. She also saw a therapist every other week but stopped when her insurance changed.

She had a breathalyzer installed on her car in July 2021 and removed it in approximately February 2023. Although she had not attended AA

meetings since March 2023 because she was busy and tired, she acknowledged the need to prioritize her services.

The social worker asked Mother, " 'If you have concerns of the trauma the children went through the last time, [w]hy did this happen again?' " Mother said she slacked on her meetings because she was stressed out and, after her boyfriend accused her of drinking, she thought, " 'If I'm being accused of drinking, [I] might as well drink.' " Before this most recent relapse, Mother claimed she had a two-year period of sobriety. She was horrified about her relapse. She wanted a stronger relapse prevention plan and understood she needed to go to meetings and speak to her sponsor.

The boyfriend declined to participate in the case even though his protective order was modified to a no negative contact order.

Father wanted placement even though he had not seen Z.B. since summer 2022. He claimed he no longer drank alcohol, although he acknowledged a history of abuse, with the longest period of sobriety being 15 months. He completed three outpatient treatment programs and one inpatient program. He had four DUI arrests, the most recent in August 2022, but none of them involved the children. He denied he drank alcohol when he cared for Z.B. He had almost a year of sobriety and admitted it was a bad decision to drive while drunk. He was also on probation, wore a SCRAM CAM bracelet, attended AA meetings four to five times per week, had a relapse prevention plan and had a sponsor.

At Mother's suggestion, the Agency assessed the Florida-based maternal grandfather for placement. The Agency was not comfortable with him being a visitation supervisor or placing the children with Mother with maternal grandfather in his home. He knew very little about Mother's relapse and had never seen her under the influence of alcohol. The Agency

was concerned he was not forthcoming when asked difficult questions, including the impact of Mother's drinking on the children.

The Agency recommended the court make a true finding on the petitions, declare the children dependents, place them in a resource family home, and order reunification services and liberal supervised visits for the parents. The Agency assessed there was a "substantial danger to the physical health" of the children if they were returned to Mother's home and there were "no reasonable means" to protect them without removal. The Agency believed given Mother's "extensive alcohol history" and DUI violations, she needed "intensive substance abuse treatment" and the ability to demonstrate "sobriety and acts of protection over time."

F.    *The Agency's Addendum Reports*

In its June 2023 report, the Agency reported that Mother pled guilty to criminal charges. She was required to serve five years on probation, obtain an alcohol monitoring device and an interlock device, and attend a multiple conviction program, a mother's against drunk driving program, a drug treatment program, and a child abuse course. Mother also had to serve 120 days on house arrest.

Meanwhile, the maternal grandfather advised he planned to go back to Florida and did not know when he would return. He suggested he could alternate between Florida and San Diego. The Agency also learned he allowed Mother to have access to the children in the home on two occasions without the presence of an approved visitation supervisor. When confronted, he initially denied a visit occurred, but eventually said he let Mother into the home briefly to use the restroom. His story did not align with Mother's story. When asked why he did not disclose that Mother was in the home with the children until asked, he replied, " 'For no real good reason. I did not think it

7

was essential to the discussion. The situation was handled in the best manner I thought was possible and that was it.' "

Mother said she was abstaining from alcohol and had 30 days of sobriety. She had her SCRAM CAM bracelet, was in a treatment program five days a week, and was attending AA meetings. She recognized she put the children in danger but wanted them back in her care.

Mother's alcohol treatment counselor informed the social worker that Mother failed to reveal the extent of her relapse or that she was put on a second section 5150 psychiatric hold. The counselor stated that this information " 'might have' " changed his assessment about whether to recommend Mother participate in inpatient treatment.

The boyfriend did not want to be involved in the case plan although he hoped he could still see the twins. For the children's sake, he hoped the Agency kept them away from Mother.

Father still was interested in taking placement of Z.B. but needed more time to figure out how to meet Z.B.'s medical and educational needs. The Agency also wanted to confirm Father's sobriety before placing Z.B. in his care.

Mother informed her AA sponsor about her relapses, and that the Agency was involved, however she neglected to share details. Her sponsor assumed the Agency was involved due to a domestic violence incident. The Agency was concerned Mother "discloses what she believes is needed in her plan for reunification rather than her path to sobriety."

By the end of June 2023, the Agency recommended the court place Z.B. with Father and terminate jurisdiction. Upon agreement of the parties, the court found good cause to bifurcate the jurisdiction from disposition. At the end of the jurisdiction hearing, the court found the allegations in the petition

true and set a contested disposition hearing at the end of June. The court also authorized a two-week out-of-state visit for Z.B. with Father.

The Agency continued to further evaluate Z.B.'s placement with Father. Father was compliant with probation, wore a SCRAM CAM, had a breathalyzer secured to his vehicle, and had the paternal grandmother as a support. His sponsor reported they spoke multiple times per week and that Father was "in the right place and . . . committed to making the right choices." He said Father had the tools he needed to maintain sobriety and was demonstrating he could use those tools. In mid-June, Father tested negative for all substances.

G. *The Contested Dispositional Hearing*

At the contested dispositional hearing at the end of June 2023, the juvenile court received the detention report, the jurisdiction and disposition report, and three addendum reports into evidence. The court took judicial notice of the sustained petition.

The social worker testified she was not aware if a formal safety inspection was completed or whether the Agency spoke with the maternal grandmother about moving into the home. She also did not know whether there was any specific individual the Agency considered to move into the home with Mother and the children. The social worker did confirm that Mother had a SCRAM CAM, tested negative for all substances, and attended treatment, therapy, AA meetings, and regularly scheduled visits with her children. She also testified about Father's history, current circumstances, cooperation, willingness to facilitate contact with Mother, and the Agency's recommendation that Z.B. be placed with him.

The maternal grandfather testified he would not allow Mother to visit if he were supervising and suspected she was under the influence of alcohol.

9

He said he would report any incidents to the Agency and would work with the Agency's rules. Despite this, he believed the children could be placed safely in Mother's care. He said he understood the court's order required supervised contact, but he did not know why.

Mother testified she had regular supervised visits at her home or the park and that she typically focused on mealtime, playing with the children, and bathing them. She did not like how much she drank during her divorce from 2016 to 2018 but believed it was circumstantial and did not realize then that she had a problem. She confirmed DUI violations in 2019, 2021, and 2023, that her SCRAM CAM was court-ordered, and that she participated in services and had frequent communication with her sponsor. Additionally, she acknowledged she relapsed because she gradually "started to attend less meetings" and "let other stuff" take precedence.

Mother further testified she would follow the Agency's rules and regulations and would provide any information requested about individuals who frequented her home. She understood she needed to change and stated, "I love being sober. And I will do whatever it takes." She said she had informed the Agency about five individuals who were open to living in her house with her and her children. They were "only evaluated for placement and were told they could not reside in [her] house and get placement of the children." Finally, Mother expressed concern for Z.B. if he was placed with Father in Iowa.

H. *Juvenile Court's Findings and Orders*

Noting the recent termination of Mother's prior dependency case, the juvenile court recounted the basis for jurisdiction, including that "driving intoxicated with one of the minors in the car" while her "blood-alcohol level content was . . . four times over the legal limit." Mother also was not "100

10

percent truthful about what happened to her support network or service providers." There also was "information in the report that there was a visit where just Mother and the maternal grandfather were present." As such, the court was concerned "about the credibility of [Mother's] testimony on the stand." Additionally, "the therapy Mother has been engaged in over the course of the time from the first dependency case . . . did not prevent" the mid-April incident. The court commended mother for attending AA meetings, noting that she is "required" to wear a SCRAM CAM, however "it is not clear how much time would transpire" before law enforcement would act following "a SCRAM violation."

The juvenile court declared there was "clear and convincing evidence" to remove custody of the children from Mother pursuant to section 361, subdivision (c)(1). "There are no reasonable means by which the [children's] health can be protected without removing the [children] from [Mother]." The court specifically found that a family maintenance plan with the maternal grandfather was not appropriate based on his testimony where he "minimize[d] the substance use issues." It also noted "the maternal grandfather's concerns about needing to spend some time . . . in California and then some time in Florida," before finding that it was "unclear . . . whether or not he would be suitable for remaining in the home."

In considering whether Z.B. should be placed with Father, the juvenile court did "not find . . . clear and convincing evidence of detriment." However, the court had concerns for Father's substance abuse and willingness to implement Z.B.'s individualized education program for his "special needs." Thus, it ordered a home visit within 90 days pursuant to section 361.2, subdivision (b)(2). It also ordered services for Mother and supervised visits and found that the foster placement for the twins was "appropriate." Finally,

11

the court set a 90-day special hearing regarding the home visit and a six-month review regarding reunification.

DISCUSSION

I.

*Relevant Legal Principles*

"The fundamental right to the care and custody of one's child is protected by Constitution and statute." (*In re Henry V.* (2004) 119 Cal.App.4th 522, 525 (*Henry V.*); accord *In re Jasmon O.* (1994) 8 Cal.4th 398, 419–420; *In re James T.* (1987) 190 Cal.App.3d 58, 64.) "A child may not be taken from a parent's physical custody during juvenile dependency proceedings, except for a temporary detention period, unless clear and convincing evidence supports a ground for removal specified by the Legislature." (*Henry V.*, at p. 525.)

Section 361 is the governing statute, and it imposes restraints on the juvenile court's authority to remove a child from a parent's physical custody. (§ 361, subd. (c).) It provides that "[a] dependent child shall not be taken from the physical custody of his or her parents, . . . unless the juvenile court finds clear and convincing evidence" that "[t]here is or would be a *substantial danger* to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, *and* there are *no reasonable means* by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1), italics added.)

We review a dispositional order removing a child from a parent for substantial evidence, "keeping in mind that the trial court was required to make its order based on the higher standard of clear and convincing evidence." (*In re I.R.* (2021) 61 Cal.App.5th 510, 520 .) "[A]ppellate review of the sufficiency of the evidence in support of a finding requiring clear and

convincing proof must account for the level of confidence this standard demands." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995.) In applying this standard of review, "the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Id.* at pp. 995–996.) We view the record in the light most favorable to the prevailing party and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence. (*Ibid.*)

## II.

### *Substantial Evidence Supports Removal of the Children from Mother's Custody*

Mother timely appealed the dispositional orders. She contends that substantial evidence does not support the court's findings and orders removing the children from her custody. We are not persuaded.

As noted, section 361 restrains a juvenile court from removing children from the physical custody of their parents unless there is clear and convincing evidence of two conditions: (1) "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being" of the children if returned home, and (2) "there are no reasonable means by which the [children's] physical health can be protected without removing" them. (§ 361, subd. (c)(1).) Accepting the juvenile court's factual findings and all reasonable inferences supporting them (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193), we conclude substantial evidence supports the court's findings that these conditions were proven by clear and convincing evidence.

A.    *There Was Sufficient Evidence of Substantial Danger to the Children If Returned Home to Mother's Custody*

Regarding the first condition, Mother argues "[t]he dispositional order removing the children from Mother was not supported because the clear and convincing standard of proof was not met." In her reply brief, she contends that the "children were not in substantial danger." She generally cites *In re Katrina* (1988) 201 Cal.App.3d 540, for the proposition that there "was a higher standard [at the disposition hearing for removal] than that required for taking jurisdiction." Mother does not cite facts or specifically challenge the evidence supporting the court's finding of substantial danger to the children if returned to Mother's custody.

Here, there was clear and convincing evidence of substantial danger to the children. The Agency's reports set forth Mother's extensive history with alcoholism, including her prior recent dependency case with the children and the services she received during that case and since. Despite her prior successful dependency case, just six months after the juvenile court terminated jurisdiction, Mother was pulled over for a DUI violation with one of her children in the car. Her relapse was substantial and was followed by two section 5150 psychiatric holds. Mother even concedes that her "history combined with her relapse was a serious concern." She admitted that her relapse happened when she "slacked on her meetings because she was stressed out." When her boyfriend accused her of drinking, she thought, " 'If I'm being accused of drinking, [I] might as well drink.' "

Although Mother engaged in services, the court found that she was not "100 percent truthful about what happened to her support network or service providers." The record shows Mother continued to tell her therapist she was sober, had a relapse prevention plan in place, had a support network, and openly discussed her treatment and self-care, despite her relapse in

14

December 2022. Similarly, Mother did not disclose to her alcohol treatment counselor the severity of her relapse or that she was twice taken to the hospital on a section 5150 psychiatric hold. She also did not discuss details of her relapses or Agency involvement with her sponsor.

These events led the Agency to have concern that Mother was "not being truthful to her service providers and/or committed to her sobriety." The court agreed. It had similar "concerns . . . about the credibility of [Mother's] testimony on the stand" and "concerns regarding protective issues relating to substance use and the impact on the minors." The social worker's professional opinion that "the risks of keeping the children in [Mother's] care without successful treatment could be lethal" is entitled to credence and supports the court's determination that there was "substantial danger to the . . . children if [they] were returned to her." (*In re Cole C.* (2009) 174 Cal.App.4th 900, 918 (*Cole C.*) ("The court was entitled to find the social worker's opinion credible and give great weight to her assessment.")

B. *There Was Sufficient Evidence of No Lesser Alternative Than Removal of the Children from Mother's Custody*

Mother's primary argument on appeal is that there was insufficient evidence to support the court's findings, by clear and convincing evidence, that there were no reasonable means to protect the children without removing them from her custody.

Section 361, subdivision (c)(1), requires a second condition be met before the juvenile court may remove a child from her parent's custody. There must also be clear and convincing evidence of "no reasonable means" of protecting the child other than removal. (§ 361, subd. (c)(1).) In other words, "California law requires that there be *no lesser alternative* before a child may be removed from the home of his or her parent." (*Jasmine G.*, *supra*, 82 Cal.App.4th at p. 284, italics added.)

15

Mother asserts that there were reasonable means to protect the children which would have allowed them to remain safely in her home. She insists services through the Agency and probation coupled with adults she claims could have lived in the home with her, were reasonable means of protecting the children thereby allowing them to stay in her care. We disagree these measures were sufficient to protect the children given other facts in the record.

The Legislature directs that a child only be removed from his or her parent if there are no reasonable means to protect the child short of removal. (See § 361, subd. (c)(1).) The juvenile court is entitled to rely on the social worker's assessment and rely on their opinion. (*Cole C.*, *supra*, 174 Cal.App.4th at p. 918 .) Ultimately, "[a]lthough the court must consider alternatives to removal, it has broad discretion in making a dispositional order." (*Ibid.*) The reviewing court cannot reweigh the evidence or substitute its judgment for that of the juvenile court. (*Ibid.*)

In the present case, substantial evidence supports that there were no reasonable means to protect the children without removing them. The juvenile court specifically considered and rejected Mother's suggestion that the maternal grandfather could live in the home with her and the children. It found that "placement in family maintenance with the maternal grandfather available to be in the home" was not appropriate because he "minimize[d] the substance abuse issues" and "need[ed] to spend some time" in both California and Florida. Substantial evidence in the record supports these findings.

The record supports the court's doubt that maternal grandfather "would be suitable for remaining in the home." The maternal grandfather testified he believed the children could be placed safely in Mother's care and

16

that she was perfectly capable of taking care of them. Although he understood her visits were supervised, he testified that he did not know why they were supervised. Additionally, he had never seen Mother under the influence of alcohol and was initially reluctant to review the graphic details of Mother's relapse in the police reports. He also evaded difficult questions about the impact her drinking had on the children and minimized the risks of driving under the influence by generalizing that anyone who drove a car was susceptible to death. Finally, he was not forthcoming about the fact that he allowed Mother to have contact with the children when he was not an approved supervisor.

The court's concern that the maternal grandfather might not be committed long term to San Diego is also supported by the record. About a month before trial, the maternal grandfather advised that he planned to go to Florida and had "not made the plans to come back out." He suggested that he may be able to alternate residing in San Diego and Florida for two weeks at a time.

Mother also argues that there were "adults who would reside in her home to add an extra security measure." At trial, she testified that there were five individuals she previously identified for placement. When Mother's counsel asked for a continuance during trial so the Agency could evaluate them, the court noted it reviewed the record, found that the Agency's efforts were "appropriate," and that it did "not find good cause to continue this matter." Substantial evidence demonstrates that the commitment levels of these five individuals varied, and that none of them indicated a willingness to move into Mother's home.

Mother also argues that other reasonable means to protect the children included alcohol testing, the SCRAM CAM bracelet and "unannounced home

17

inspections by the social worker and the children's attorney." But the court correctly found that "there would be a delay" before law enforcement arrived following a SCRAM violation if Mother drinks alcohol. Similarly, unannounced visits and substance abuse testing only detect Mother's alcohol use after the children have been put at risk of harm. (*In re A.F.* (2016) 3 Cal.App.5th 283, 293 ["Unannounced visits can only assess the situation and mother's sobriety at the time of the visit. Substance abuse testing can only detect use after the fact—which would be after mother had already placed the minor at risk again."].) Thus, the court correctly concluded that these suggestions were not means to protect the children.

In her reply brief, Mother argues that "she admitted the problem and began working hard to ensure it did not happen again." She points to her participation in a substance abuse program and her criminal probation requirements as "an extensive recovery plan for [M]other to comply with." The juvenile court did, in fact, consider whether the reasonable means Mother suggests could have prevented removal of her children, including "her work engaging in voluntary services," attendance at AA meetings, and wearing a SCRAM CAM bracelet. While it praised Mother's efforts as "commendable," it ultimately rejected her suggestions due to her credibility and history, the severity of her relapse, and the fact that her participation in therapy since the last dependency case did not prevent her from relapsing. Indeed, even though a parent such as Mother may be participating in services, removal can still appropriate due to a significant history of substance abuse. (*In re J.C.* (2014) 233 Cal.App.4th 1, 7 ["Given his years-long struggles with drug abuse, his seven months of sobriety did not mean that he was no longer at risk of relapsing."].)

18

Finally, despite Mother's citations to *In re Henry V., supra*, 119 Cal.App.4th 522, that case is not helpful to her. (*Id.* at pp. 529–530 ["The social worker's suggestion that out-of-home placement would be useful to secure [the mother's] further cooperation was not a proper consideration. . . . A mother's fundamental right to the custody of her child is not a bargaining chip."].) There, as opposed to here, there was "ample evidence that appropriate services could have been provided to [the mother and child] in the family home," while there was not "clear and convincing evidence of a threat to [the child's] safety or emotional well-being." (*Id.* at p. 529.)

Here, substantial evidence supports the juvenile court's decision to remove the children from Mother's custody. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 319 [" ' "When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' "].) We conclude that the court did not abuse its discretion. (*In re Tanis H.* (1997) 59 Cal.App.4th 1218, 1227 [The trial court has "broad discretion to determine what best serves a child's interests"].)

19

## DISPOSITION

The juvenile court's dispositional orders are affirmed.

DO, J.

WE CONCUR:


IRION, Acting P. J.


CASTILLO, J.